IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AGL SERVICES COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | NO. _____ |
| MISTRAS GROUP, INC., | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

## COMPLAINT

Plaintiff AGL Services Company files this Complaint, alleging as follows:

### Statement of the Case

1.     AGL Services Company is an affiliate of Southern Company Gas,
f/k/a AGL Resources, Inc. (together, "AGL"), the largest natural gas-only
distribution company in the United States and the owner of thousands of miles of
underground pipeline for transporting natural gas, including thousands of miles of
pipeline in Georgia.  Founded in 1856, AGL has been at the forefront of providing
safe and environmentally friendly natural gas throughout the United States, serving
the energy needs of millions of households and businesses.

2.     AGL's Eastside Pipeline Project (the "Project") was an effort to
replace approximately 27 miles of buried pipe that runs through suburban Atlanta

neighborhoods from Clayton County, through Fulton County, to a connection point in DeKalb County.  To ensure the safety and integrity of the new pipe, AGL hired experts that purported to be the foremost experts in the field to engineer, construct, oversee, and inspect the work on the Project.

3.     One of those "experts" was defendant Mistras Group, Inc. ("Mistras"). AGL hired defendant Mistras pursuant to a Master Services Agreement (the "Agreement") to perform non-destructive examinations of welds on the natural gas pipeline before it was buried. Among other aspects of these examinations was to make digital x-ray images of each weld. In making the images, Mistras was contractually obligated to follow the procedures in API Section 1104 and AGL guidelines and specifications, and to otherwise satisfy applicable safety codes, standards, and industry practices so that, in turn, Mistras could ensure that the welds themselves met all applicable codes, standards, and industry practices. Because Mistras failed to perform non-destructive examinations of the welds in a manner that satisfied these requirements, many of the images had to be redone, which required excavation of the newly buried sections of pipeline.

4.     When Mistras failed to take appropriate corrective action, AGL was forced to hire another party to complete that work.

5.     AGL now seeks to recover its damages.

## The Parties, Jurisdiction and Venue

6.     Plaintiff AGL Services Company is a Georgia corporation with its principal place of business in Atlanta, Fulton County, Georgia.  AGL Services Company is a wholly-owned subsidiary of Southern Company Gas f/k/a AGL Resources Inc., which is also a Georgia corporation with its principal place of business in Atlanta, Fulton County, Georgia.

7.     Defendant Mistras is a Delaware corporation with its principal place of business in New Jersey.  Mistras may be served through its Georgia registered agent, Corporation Service Company, at 40 Technology Parkway South Suite 300, Norcross, Georgia 30092.

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between AGL and Mistras, which are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     Mistras is subject to personal jurisdiction because Mistras "consent[ed] and submit[ted] to the *in personam* jurisdiction" of this Court. Agreement § 15.9.  Mistras also is subject to personal jurisdiction because it regularly transacts business in Georgia, it entered into the Agreement in Georgia, and the occurrences and transactions at issue occurred in Georgia.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.   In addition, in the Agreement, Mistras "waive[d] any objection to venue of any action instituted hereunder to the extent that an action is brought in the [Northern District of Georgia, Atlanta Division]."  Agreement § 15.9.

**The Parties Enter into the Master Services Agreement**

11.     AGL provides reliable, safe, and clean energy to more than 1.5 million customers throughout Georgia.  They operate and maintain natural gas pipelines and other natural gas infrastructure, read meters, and deliver natural gas to customers of certificated natural gas marketers.

12.     The Project was an effort to replace approximately 27 miles of old pipe, installed in the early 1950s, with new 24-inch diameter coated steel transmission pipelines.  These pipelines run from AGL's Riverdale liquefied natural gas facility in Clayton County to a connection point in AGL's pipeline system near the intersection of Buford Highway and Clairmont Road in DeKalb County.  There are five distinct segments of the Eastside Project, labeled Segments 1 through 5.

13.     As part of the quality checks and inspections on the Project, AGL must verify that the quality of the welds – which join the pieces of pipe in the pipeline – meet applicable standards.  Mere visual inspection of the welds on the

pipeline may not identify problematic welds because, unbeknownst to the welder, a weld on a natural gas pipeline may not completely cohere the pipelines together.

14.    Due to the limitations of visual inspections of welds, the industry, working with regulators and other entities, has developed methods of performing non-destructive examinations.  One of the accepted methods of non-destructive examinations is computed radiography, or the use of x-rays and/or other imaging technology to perform detailed examinations of welds.  It is mandatory that the computed radiography in question be documented with records that are capable of clear interpretation and are maintained and kept for reference and further examination as needed to maintain public safety and provide proof of the compliance with all applicable standards and regulations.

15.    After non-destructive examinations have confirmed weld cohesion, approval is given to proceed with construction, including the burying of the pipeline and the restoration of the land.

16.    AGL searched for a company that could perform non-destructive examinations and assess the weld quality on the Eastside Project. Mistras represented that it could assess the weld quality through x-rays and confirm that the welds satisfied all AGL requirements and applicable industry standards, including but not limited to regulations promulgated by the Pipeline and Hazardous

Materials Safety Administration ("PHMSA") and codes and standards developed by the American Petroleum Institute ("API").

17.    On or about May 29, 2012, AGL and Mistras executed the Agreement.  A copy of the Agreement is attached and incorporated by reference as **Exhibit A**.  In September 2012, AGL and Mistras agreed on a Statement of Work entitled "Non Destructive Weld Examination Services PRP4 – Eastside Pipeline" ("SOW A-5") detailing the weld examination services Mistras would provide on the Eastside Project. A copy of SOW A-5 is attached and incorporated by reference as **Exhibit B**.

18.    Pursuant to SOW A-5, Mistras agreed to "provide on-site [non-destructive examination] services for testing and evaluating pipeline materials and/or pipeline welds for [the Eastside Project]."  SOW A-5 § 4.1.  Specifically, Mistras agreed to use the computed radiography method of non-destructive examinations, which produces a digital x-ray image that can be used to verify the quality of welds.  SOW A-5 § 4.2.  This method was referred to as the "Standard Method" in the SOW A-5.  *Id.*

19.    Pursuant to SOW A-5, Mistras agreed to "examine one hundred percent (100%) of the welds on pipe installed by either Horizontal Directional

Drill, Jack and Bore or trench method using the Standard Method of non-destructive examinations on every weld."

20.    SOW A-5 provides that "[Mistras] shall follow the procedures in both the latest PHMSA approved edition of API 1104, Attachment 1 – 'AGL Resources Guidelines for Welding Inspection' and Attachment 2 Operations Procedures Manual."  SOW A-5 § 8.2.  As a result, Mistras was required to satisfy the procedures and standards set forth in API 1104, the AGL Resources Guidelines for Welding Inspection ("AGL Guidelines"), and the Operations Procedures Manual.

21.    The AGL Guidelines serve as a "guideline that welding inspectors both internal and external to AGL Resources should follow when inspecting welds on AGL Resources pipelines."  AGL Guidelines § 1.0.  The AGL Guidelines mandate that inspectors comply with API 1104.  *Id.* § 2.0.

22.    The AGL Guidelines specify that "[r]adiographs and their interpretation shall conform to Appendix A – Radiographic Film Interpretation Procedure ['Appendix']."  *Id.* § 5.2.  Section 4.1 of the Appendix provides that the contract film interpreter, *i.e.* Mistras, is "responsible for interpreting the radiographs in accordance with the acceptability requirements of API 1104, latest approved edition, and/or other company specification requirements."  Section 4.2 of the Appendix further provides that "[a]ll radiographs shall be interpreted in

accordance with the acceptance criteria of API 1104, latest approved edition, and/or additional specifications requirements." A true and correct copy of the AGL Guidelines and Appendix A thereto is attached as **Exhibit C**.

23.     Section 11 of API 1104 sets forth the procedures for non-destructive testing.  It provides that radiographic film must meet certain standards for density, clarity, and contrast in order for it to satisfy Section 11 of API 1104.  API 1104 § 11.1.1.  It also provides that images produced by other systems "shall have the requisite sensitivity to define clearly the essential wire diameter of the proper image quality indicator (IQI)." *Id.*

24.     Section 11.1.5 of API 1104 provides that the "radiographic images of the IQI identifying style number and ASTM [American Society for Testing and Materials] set letter or IOS [International Organization for Standardization] designation shall appear clearly.  The image of the essential wire diameter shall appear clearly across the entire area of interest."

25.     The image quality of the weld x-rays was to satisfy the image quality standards set forth in Section 11 of API 1104 and Mistras was to confirm that the welds themselves satisfied the standards set forth in Section 9 of API 1104, which governs the acceptance standards for non-destructive testing.

26.     Pursuant to SOW A-5, Mistras also agreed to satisfy certain reporting requirements.  Specifically, Mistras agreed to "create and complete a daily weld inspection report [the 'Weld Inspection Report']."  SOW A-5 § 11.1.  The "[w]eld Inspection Report must be updated daily and all Weld Inspection Reports for a particular week must be posted weekly throughout the duration of the [Eastside] Project."  *Id.*  Mistras also was required to submit a weekly status report ("Status Report") that outlined information such as the number of hours worked per day, number of miles travelled, and number of welds completed per day, among others. *Id.* § 11.3.

27.     Mistras also agreed to certain productivity requirements in SOW A-5.  Pursuant to Section 13.2 and 13.3, Mistras was required to perform, on average, 25 welds per day with a 2-man crew and 30 welds per day with a 3-man crew.  In the event of "negative production variances from the Average Welds per Day for Crews," Mistras was to submit weekly a report "with a detailed explanation for the negative variance."  SOW A-5 § 13.3.4.

28.     Pursuant to the Agreement, Mistras represented and warranted to AGL that:

> (a) It will perform the Services at the time and place of performance specified herein with the highest standard of care, skill and diligence expected of recognized professionals performing services of a similar type and nature, but in no event

> less than a reasonable standard of care; . . . (c) the Work
> Product will be free from defects in design, materials and
> workmanship and will be fit for the purposes for which it is
> intended; (d) the Work Product and the Services will conform
> in all respects with the requirements of this Agreement and any
> applicable SOW, and in all cases will comply with applicable
> state, federal and local laws, rules and regulations.

Agreement § 7.1.  As a result, Mistras was required to perform its services with the

highest standard of care, skill and diligence.  Furthermore, Mistras was required to

satisfy all applicable state, federal and local laws, rules, and regulations, including

but not limited to the Federal Pipeline Safety Act, the Pipeline Safety Program, and

Georgia's Pipeline Safety Procedures.

29.    Mistras further agreed that, "[d]uring the term of th[e] Agreement,

[Mistras would] fully comply with all applicable laws, government regulations,

rules, requirements, ordinances and other requirements of local and state

authorities and the Federal government . . . ."  Agreement §15.13.  These laws and

regulations include but are not limited to the ones referenced in the prior

paragraph.

30.    Pursuant to the Agreement, Mistras agreed that:

> In the event that the Services or the Work Product fail to
> conform to this warranty, in addition to any other remedies
> [AGL] may have under this Agreement or otherwise, at
> [AGL's] option, [Mistras] will either re-perform, at no
> additional cost to [AGL], any Services that do not meet the
> warranty, or refund to [AGL] all fees previously paid therefore

and reimburse [AGL] for any incremental costs incurred in obtaining substitute services or work product from another vendor. [AGL] will use reasonable efforts to notify [Mistras] of such failure within one year after the date the last of the Services are performed, abandoned or terminated, or the date upon which [AGL] discovers such warranty failure, whichever should occur later.

*Id.* In other words, if Mistras breached the warranty, in addition to any other remedies AGL may have under this Agreement or otherwise, Mistras was required to (1) retake the weld x-rays at Mistras's expense or (2) refund all fees received from AGL and reimburse AGL for any costs incurred to obtain a third party to retake the weld x-rays.

31.  Pursuant to the Agreement, AGL was entitled to:

[T]erminate one or more SOWs, in whole or in part or this Agreement as a whole (a) immediately upon written notice if [Mistras] breache[d] any material obligation under this Agreement; and (b) at any time without cause and in its sole discretion upon seven (7) days prior written notice to [Mistras].

Agreement § 4.3.

32.  If AGL terminated the Agreement pursuant to (a) above, AGL was permitted to "complete the Services itself or hire another contractor to complete it." *Id.* Upon completion of the Services:

[Mistras would] be paid any undisputed fees incurred for Services rendered prior to the termination date less all costs incurred in finishing the Services, including compensation for overhead, for administrative and managerial services and for

> any legal expenses incurred by [AGL] to effect the takeover and complete the Services.  Such costs and expense shall include not only the cost of completing the Services, but also losses, damages, costs and expenses, including attorneys' fees and expenses, incurred by [AGL] in connection with the reprocurement and defense of claims arising from [Mistras's] default.  If [AGL's] costs exceed the unpaid balance, [Mistras] shall pay the difference to [AGL].

*Id.* § 4.3.1.  Thus, upon any breach of a material obligation under the Agreement, and in addition to any other remedies AGL may have under this Agreement or otherwise, AGL was entitled to terminate the Agreement (or the SOW) and recover all costs incurred in hiring a third party to complete services that were to have been provided by Mistras.  Under these circumstances, AGL also was entitled to recover other consequential expenses, including, but not limited to, legal and overhead expenses.

### **Mistras Fails to Perform as Required**

33.   On or around October 9, 2012, Mistras began its work pursuant to SOW-5.

34.   Mistras performed x-rays of approximately 7 welds before AGL became concerned with the quality of Mistras's weld x-rays.

35.   On or around October 17, 2012, Eastside Project's construction inspector, Double M, Inc. ("Double M"), raised a concern with the image quality

of Mistras's weld x-rays.  Specifically, David Davis from Double M stated that the weld x-rays were "unacceptable" and "no good."

36.    Because of Double M's concerns, the parties met to discuss concerns with the image quality of Mistras's weld x-rays on or around November 1, 2012. During the meeting, Chuck Hellier, Group Director of Mistras, agreed that there were significant issues with the quality of Mistras's weld x-rays.  Mr. Hellier agreed to review all weld x-rays performed to date and to submit a Corrective Action Report outlining the steps that Mistras would take to correct these issues.

37.    On or around November 21, 2012, Mistras submitted a Corrective Action Report to AGL ("First CAR").  Consistent with Mr. Hellier's admissions at the November 1, 2012, meeting, in the report, Mistras admitted that there was an "image quality issue with various welds inspected on the [Eastside P]roject, Segments 1, 4, and 5 during the dates of October 13th, 2012 thru November 1st, 2012."  Because Mistras allegedly had applied "[n]ew system settings" and completed "technician re-training," Mistras claimed that the "code quality interpretation of the welds as required by API 1104 [was] complete and satisfactory" and purported to close the First CAR.

38.    Dissatisfied by what it perceived as an insufficient response and ongoing concerns generally regarding the quality and timeliness of Mistras's

services, AGL submitted a "Work Stand-down" notification to Mistras on or around November 27, 2012. In the notification, AGL noted that there had been "ongoing issues with the quality of the images" and requested that Mistras stop all work "until such time that [AGL is] satisfied [Mistras's] team and technology can meet the quality, timeliness and technology [AGL] demand[s] . . . ."

39.     On or around November 30, 2012, the Parties met to discuss AGL's continued concerns with the image quality of Mistras's weld x-rays. During the meeting, Mistras agreed to perform a full audit of all images performed on the Eastside Project and to submit another Corrective Action Report.

40.     Subsequent to the parties' meeting, Mr. Hellier again acknowledged the errors made by Mistras. Specifically, on December 2, 2012, Mr. Hellier stated that he was "deeply sorry" for the "disappointment of the Mistras start" on the Eastside Project and for Mistras "let[ting AGL] down in various areas."

41.     On or around December 4, 2012, Mistras submitted a second Corrective Action Report to AGL ("Second CAR"). In correspondence relating to the Second CAR, Mistras admitted that "[p]rior to November 09, 2012, there [were] Two Hundred and Sixty Five (265) images lacking desired image quality in accordance with Paragraph 11 of the API 1104 code, 20th Edition." Mistras also acknowledged that its audits had "identified image quality issues with various

welds inspected" on the Eastside Project.  Specifically, Mistras stated that one image "should have been identified as rejectable" and five images did "not provide a weld image where the weld quality could be determined and should be radiographed again."  Nevertheless, Mistras asserted that the images permitted a conclusion that the "computer radiography technology allows with certainty a determination as to the acceptability of the weld quality as reported to date on the Eastside [P]roject."  Mistras further stated that "Mistras assumes full responsibility for these conclusions."

42.    Following the Second CAR, three of the six welds questioned by Mistras were unburied and evaluated.  Of the three welds that were unburied, one weld required repair.  Once the weld was repaired, Mistras took the position that it had completed the steps outlined in its Second CAR, despite numerous other weld x-rays also falling below the standards set forth in API 1104, among others.

43.    During the course of the Agreement, Mistras failed to comply with other terms under the Agreement.

44.    For example and without limitation, Mistras failed to comply with the reporting requirements detailed in SOW A-5.  Mistras failed to provide AGL with at least two of the x-ray weld images in violation of Section 11 of SOW A-5.  Despite multiple requests, Mistras was unable to locate the images.  It is hard to

understand how Mistras could lose a weld's x-rays if its operations were in compliance with safety standards.

45.    In addition, Mistras failed to meet the productivity requirements under Section 13 of SOW A-5.  Indeed, their productivity levels dropped off significantly once AGL raised issues with the quality of Mistras's weld x-rays.

46.    Due to its dissatisfaction with Mistras, AGL hired a third party, Applied Technical Services, Inc. ("ATS"), to perform a third-party audit of Mistras's weld x-ray images.  ATS completed its audit in February of 2013.  ATS concluded that a "substantial number" of Mistras's x-rays were rejectable "due to nonconforming image quality."

47.    In its report, ATS concluded that the images associated with 147 of the welds evaluated by Mistras did not conform to API 1104.  Images associated with 5 of those welds were missing.

48.    On June 6 and July 30, 2013, AGL sent letters to Mistras, notifying Mistras of its continuing concerns with Mistras's weld x-ray images.  AGL further notified Mistras that it had no choice but to re-take the weld x-ray images taken by Mistras that failed to pass API 1104.  AGL notified Mistras that it would excavate the sections of the pipeline with the questionable welds to perform non-destructive examinations of the welds.

49.     AGL excavated the then-buried sections of the pipeline in order to re-take the weld x-rays to verify welds' conformance with API 1104, among other standards.

50.     Out of the 147 welds that were excavated and re-shot at AGL's expense, 10 were found to contain weld defects that required repair.

51.     AGL incurred approximately $6 million in costs to remedy the damages caused by Mistras.  This includes, among other things, the cost of excavating the affected areas (to access the welds), retaking the weld x-rays, performing non-destructive examinations, repairing non-conforming welds, reburying the pipeline, and repaving and otherwise restoring the affected areas.

52.     Mistras agreed to indemnify and hold AGL harmless from and against any and all damages, losses, costs, and expenses, including reasonable attorney's fees, incurred by AGL that "arise out of or relate to the Services by Contractor or its employees… ."

53.     Mistras has refused to pay AGL for damages resulting from Mistras's breach of contract and/or professional negligence.

## COUNT I

## (Breach of Contract)

54.     AGL incorporates herein by reference paragraphs 1 through 53 of its Complaint as fully set forth herein.

55.     Under Section 8.2 of SOW A-5, Mistras agreed to follow the procedures and standards set forth in (1) API 1104, (2) the AGL Guidelines, and (3) the Operations Procedures Manual.

56.     The AGL Guidelines mandates that inspectors must comply with API 1104.  AGL Guidelines § 2.0.  The AGL Guidelines also incorporate the Appendix. *Id.* § 5.2.  Section 4.1 of the Appendix provides that the contract film interpreter, *i.e.* Mistras, must satisfy API 1104 as well as other company specification requirements.  Section 4.2 of the Appendix further provides that all radiographs must meet the acceptance criteria of API 1104, as well as other additional specifications requirements.

57.     Section 11 of API 1104 sets forth the procedures for non-destructive testing.

58.     Pursuant to SOW A-5, Mistras also agreed to create and complete the Weld Inspection Report, which was to be updated daily and posted weekly.  SOW A-5 § 11.1.  Mistras was also required to submit a weekly Status Report that

outlined information such as number of hours worked per day, number of miles travelled, and number of welds completed per day, among others. *Id.* § 11.3.

59.    Mistras also agreed to certain productivity requirements in SOW A-5. Pursuant to Section 13.2 and 13.3, Mistras was required to perform, on average, 25 welds per day with a 2-man crew and 30 welds per day with a 3-man crew.  In the event of "negative production variances from the Average Welds per Day for Crews," Mistras was to submit weekly a report "with a detailed explanation for the negative variance."  SOW A-5 § 13.3.4.

60.    Pursuant to Section 4.3 of the Agreement, for breach of the Agreement, including SOW A-5, AGL is entitled to recover any amount incurred by AGL to re-take the weld x-rays, including compensation for "overhead, for administrative and managerial services and for legal expenses incurred by [AGL] to effect the takeover and complete the [x-rays].  Such costs and expense shall include not only the cost of completing the [x-rays], but also losses, damages, costs and expenses, including attorneys' fees and expenses, incurred by [AGL] in connection with the reprocurement and defense of claims arising from [Mistras's default]."  Agreement § 4.3.1.

61.    In October of 2012, Mistras began performing weld x-rays of the welds used in the Eastside Project.

62.     Mistras performed weld x-rays for approximately 238 welds.

63.     Despite admitting image quality issues with numerous weld x-rays, Mistras only re-imaged 3 welds, and one of those welds actually required repair.

64.     AGL's third-party auditor of the weld x-rays has confirmed that the x-rays performed for approximately 147 of the 238 welds do not meet the code quality interpretation requirements of API 1104, among other standards.

65.     Mistras's failure to take weld x-rays that meet the code quality interpretation requirements of API 1104 constitutes a breach of the AGL Guidelines, SOW A-5, and the Agreement.

66.     Mistras has refused to pay for AGL's costs in hiring a third party to re-take these weld x-rays.

67.     Mistras also failed to comply with the reporting requirements detailed in SOW A-5.  Mistras failed to provide AGL with at least two of the x-ray weld images, in violation of Section 11 of SOW A-5.  In addition, Mistras failed to meet the productivity requirements under Section 13 of SOW A-5.

68.     As a proximate result of Mistras's breaches, AGL has suffered direct and consequential damages in an amount to be proven at trial, including without limitation attorneys' fees and interest.

## COUNT II

## (Breach of Warranty)

69.     AGL incorporates herein by reference paragraphs 1 through 68 of its Complaint as fully set forth herein.

70.     Pursuant to Section 7.1 of the Agreement, Mistras represented and warranted to AGL that its "[w]ork Product w[ould] be free from defects in design, materials and workmanship and w[ould] be fit for the purposes for which it [was] intended."  Mistras further represented and warranted that the "Work Product and the Services w[ould] conform in all respects with the requirements of this Agreement and any applicable SOW, and in all cases w[ould] comply with applicable state, federal and local laws, rules and regulations."  Agreement § 7.1.

71.     In the event Mistras failed to conform to the warranty in the Agreement, Mistras agreed to (1) retake the weld x-rays at no additional cost to AGL or (2) refund all fees previously paid by AGL and reimburse AGL for all costs incurred in obtaining a third party to retake the weld x-rays.  Agreement § 7.1.

72.     Starting in October of 2012, Mistras began performing weld x-rays of the welds used in the Eastside Project.

73.     Mistras performed weld x-rays for approximately 238 welds.

74.    Despite admitting image quality issues with numerous weld x-rays, Mistras only re-imaged 3 welds, and one of those welds actually required repair.

75.    AGL's third-party auditor of the weld x-rays has confirmed that the x-rays performed for approximately 147 of the 238 welds do not meet the code quality interpretation requirements of API 1104, among other standards.

76.    Mistras's failure to take weld x-rays that meet the code quality interpretation requirements of API 1104 constitutes a breach of warranty under Section 7.1 of the Agreement.

77.    Mistras has refused to pay for third-party costs to re-take these weld x-rays.

78.    As a proximate result of Mistras's actions, AGL has suffered direct and consequential damages in an amount to be proven at trial, including without limitation attorneys' fees and interest.

## COUNT III

### (Professional Negligence)

79.    AGL incorporates herein by reference paragraphs 1 through 78 of its Complaint as fully set forth herein.

80.    Pursuant to the Agreement, Mistras had a duty to perform its services "with the highest standard of care, skill and diligence expected of recognized

professionals performing services of a similar type and nature, but in no event less than a reasonable standard of care." Agreement § 7.1.

81.    Mistras breached this duty by taking x-rays for at least 147 welds that failed to meet the code quality interpretation requirements of API 1104, among other standards.

82.    As a result of Mistras's breach of the duty to perform its services with the care, skill and diligence expected of recognized professionals performing services of a similar type and nature, AGL has suffered direct and consequential damages in amount to be determined at trial.

## COUNT IV

### (Breach of Agreement to Indemnify)

83.    AGL incorporates herein by reference paragraphs 1 through 82 of its Complaint as fully set forth herein.

84.    Mistras agreed to indemnify AGL against any and all damages, losses, costs, and expenses, including reasonable attorney's fees, incurred by AGL that arise out of or relate to the negligence or breach of contract of Mistras or its employees.

85.    As set forth herein, AGL has suffered damages and expenses, including attorney's fees, that arise out of or relate to the breach of contract or

negligence of Mistras.   AGL demanded that Mistras indemnify AGL for these losses, but Mistras has failed to do so, further breaching its agreement with AGL.

## COUNT V

### (Litigation Expenses)

86.    AGL incorporates herein by reference paragraphs 1 through 85 of its Complaint as fully set forth herein.

87.    Mistras has acted in bad faith, been stubbornly litigious, and caused AGL unnecessary trouble and expense.   AGL is therefore entitled to recover its attorney's fees and costs under O.C.G.A. § 13-6-11 or as otherwise may be provided by law.

## DEMAND FOR JURY TRIAL

AGL demands a trial by jury on all issues so triable as a matter of right and law.

## PRAYER FOR RELIEF

WHEREFORE, AGL respectfully asks for the following:

(a)    That the Court enter judgment in favor of AGL on all causes of action;

(b)    On Counts I, II, III, and IV, an award of damages in an amount to be determined at trial;

(c)     This case be tried by a jury;

(d)     On all claims for relief, an award of AGL's reasonable attorneys' fees, pre-judgment and post-judgment interest, costs and the expenses of this action; and

(e)     On all claims for relief, for such other, further and different relief as this Court deems just and proper.

Submitted this 1st day of November, 2016.

KING & SPALDING LLP

/s/ John P. Brumbaugh
John P. Brumbaugh
Georgia Bar No. 085378
Amy Yervanian Jones
Georgia Bar No. 780817

1180 Peachtree Street, NE
Atlanta, Georgia 30309
(404) 572-4600 (telephone)
(404) 572-5100 (fax)

Craig J. Ledet*
1100 Louisiana, Suite 4000
Houston, Texas 77002
(713) 276-7426 (telephone)
(713) 751-3290 (fax)

ATTORNEYS FOR PLAINTIFF
AGL SERVICES COMPANY

*Pro Hac Vice Application forthcoming